UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                                          Case No. 8:24-cr-547-WFJ-AAS

REGINALD JELKS
_____/

**ORDER**

This matter came before the Court upon Defendant Reginald Jelks' ("Jelks or Mr. Jelks") motion to suppress.  Dkt. 24.  Mr. Jelks is facing indictment for felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  Mr. Jelks contends that a deputy's stop of his car for a traffic infraction was unconstitutionally extended to locate and employ a narcotics-sniffing dog, which alerted.  And the subsequent search of his car allegedly yielded a digital scale with fentanyl residue and an illegally-possessed pistol.  The Government responded to the motion.  Dkt. 31.  The Court held an evidentiary hearing on June 9, 2025.  The Court denies the motion.

*BACKGROUND*

Mr. Jelks was parked at a Wawa gas station at about 5:00 pm on August 12, 2024, at the intersection of MLK Boulevard and U.S. 301, Hillsborough County. The uncontested evidence is that this area was known for its higher crime rate,

including street crimes such as drug trafficking. The deputies involved were from the Sheriff's "street crime" unit.

Jelks was parked at the Wawa, in his car, for thirty minutes. He changed the position of his car one time during this period. He was approached by an unknown female at one point, and later by an "Uber Eats" driver who apparently delivered a parcel or item. The car, a Chevrolet Impala, had a fairly dark window tint. An undercover Sheriff's Deputy in an undercover car observed these goings on, and reported it to a sergeant, who deemed it suspicious. The radio traffic shows that the deputies considered deliveries of that type to be possibly nefarious. The sergeant began to make inquiry about the availability of a drug detection dog.

Mr. Jelks departed the Wawa, and fairly soon thereafter he made two traffic infractions: on two occasions he intruded over the "stop bar" present on the roadway while stopped at a red light or a stop sign. The present motion does not contend that the stop for the traffic infraction was a pretext or illegal. Rather, the gist of the motion is that the officer unlawfully prolonged the routine traffic infraction to permit a narcotics sniffer detection dog to arrive, where it alerted.

The evidence is fairly uncontested. The two deputies having the most contact with Mr. Jelks wore body cameras, and those are in evidence. The deputy stopping Jelks for the traffic infraction, Joann Richter, pulled him over fairly close to the Wawa. Deputy Richter testified at the hearing, and the Court found her

credible. The defense did not argue that she was not credible. The body camera from Richter is the most relevant. The "pull over" of Jelks starts at about forty seconds into the tape (":40"), and the first interaction between Mr. Jelks and Richter is at about 1:01, meaning one minute, one second shown on the videotape timer at the bottom of the viewing screen. Govt. Exhibit 2.

At the time of the traffic stop, Mr. Jelks had in his front seat a fresh dinner plate which appeared likely to have been dropped off by the delivery driver. He explained that he was at the Wawa because his cousin had ordered him a food delivery. At timer mark 1:00–2:15 into the body camera tape, Deputy Richter had informed Mr. Jelks that he was stopped for intruding past the stop bar while stopped. During this time the deputy had requested and received from Jelks the registration and driver's license. She was back in her car working on the citation by mark 2:35. She requested that the other deputy present ask Mr. Jelks for consent to search his car. After a bit of discussion and back and forth, Mr. Jelks declined somewhat indignantly.

During the time the deputy was working on the infraction, her sergeant had ordered up the narcotics detector dog. The deputies knew that it was en route to their location. At one point Deputy Richter answered the sergeant's radioed question (slightly over ten minutes into the stop) as to the exact location.

By time marker 2:45 (about two minutes after Deputy Richter started the stop, and about one minute, forty-five seconds after encountering Jelks), Richter had contacted dispatch with her location and informed dispatch that she was conducting a traffic stop.  By 4:20 (about three minutes, forty seconds into the stop), she had inputted the license tag and driver's license to see on the computer if they were still valid, using the computer and on-line service in her cruiser.  By time marker 4:35–45 she had a "hit" from the computer on who the stopped party was, so, for safety reasons, the officers could see who they were dealing with.  (Mr. Jelks has a very extensive record.)  At 5:30 Richter was still working on the traffic ticket.  By 6:25 she returned to Jelks who had been sitting in his car with the window down, for the purpose of verifying that the vehicle identification number on the registration matches the physical number present on Jelks' car.  She testified credibly that this is done in all cases.  She also asked Mr. Jelks for an updated phone number for the infraction ticket, and at 6:52–7:23 she inquired as to his present address, to be sure it matched the one on the driver's license he presented.  It did.  By timer mark 7:50 Richter is back at her car working on the ticket, using the computer.  This continues for several minutes.

Having verified all the information and found out the details of Mr. Jelks' record, she then began typing up the ticket into the computer.  She continued working on the ticket:  At 10:00 she is still working on her computer screen.  From

4

this point, through 13:30 she is writing up the traffic infraction (which is a warning ticket for crossing the stop bar). Mr. Jelks had been stopped for about twelve minutes, thirty seconds at this point.

    The detector dog and handler arrived just before 13:40, which is thirteen minutes after the "pullover" began. Deputy Richter had not finished her infraction paperwork. At this time she radioed her two colleagues standing by Jelks' car, telling the colleagues to have Jelks alight from the car so a sniff can occur. At time marker 13:46, Richter thanks the handler for coming and says to the handler, "They are going to get him out of the car while I work on my traffic stop." But at 14:01 Richter exits her cruiser briskly. Mr. Jelks had delayed obeying the command of the other deputies to get out of the car.

    When Mr. Jelks did not get out of the car immediately when instructed, and instead rolled up the window, Deputy Richter became concerned for officer safety and she got out of her cruiser and quickly approached Jelks' car (which was about ten yards away) for safety's sake. She viewed this slow compliance of Mr. Jelks as a concern, a "red flag." She asked the two deputies at Jelks' car "Is there a reason he rolled up the window?" The window had a dark tint. She viewed this as a possible safety threat, and, according to Richter, it was unlike the deputy at the car to permit this delay.

5

At marker 14:13 Mr. Jelks gets out of the car and begins to walk toward the back with the two other deputies. Deputy Richter keeps her eye on him as he passes her by, until time marker 14:30 whereupon she turns to the dog handler, and at this time 14:33–34, the dog is now alerting (or appears to be alerting) upon the driver's side door of Jelks' car. After announcing the alert, the dog handler and dog leave immediately and Mr. Jelks is arrested by the other two deputies based on probable cause

According to Richter, at the time the dog and handler arrived, up to five more minutes would have remained in that task of writing the ticket, finalizing it, assembling Jelks' documents that she had collected, and returning to Mr. Jelks and explaining the civil warning citation. But that did not happen like a regular infraction because the dog alerted on the car almost immediately, changing the subject to criminal probable cause.

The dog arrived at time marker 13:40, which was thirteen minutes after the pull-over of Mr. Jelks' was commanded by Deputy Richter in her cruiser. The dog alerted at time marker 14:33. All told the Jelks traffic stop had lasted just under fourteen minutes from pull-over to dog alert. Had there been no dog, and Deputy Richter finished writing the infraction and sent Mr. Jelks on his way with his paperwork, the stop would have likely been slightly under twenty minutes in duration.

There is no issue presented that the dog alert failed to create probable cause. After the dog alerted, the deputies searched Mr. Jelks' car and found a loaded Ruger pistol, apparently in the front console, and a digital scale with residue that field tested for fentanyl. Mr. Jelks was arrested. Deputy Richter finished writing up the warning infraction and other paperwork, provided the ticket to Jelks and his car to his mother who was at the casino nearby, and took Mr. Jelks to jail.

## DISCUSSION

When conducting a traffic stop, it must be "limited in scope and duration," *Florida v. Royer*, 460 U.S. 491, 500 (1983), and the stop cannot be unlawfully prolonged. *See Rodriguez v. United States*, 575 U.S. 348, 354–56 (2015). The Supreme Court explained that "[a] seizure for a traffic violation justifies a police investigation of that violation." *Id*. at 354. But reasonable suspicion to make a traffic stop does not give an officer "unfettered authority to detain a person indefinitely." *United States v. Campbell*, 26 F.4th 860, 881 (11th Cir. 2022) (*en banc*), *cert. denied*, 143 S. Ct. 95 (2022). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Id*. (citations omitted).

In conducting a traffic stop, an officer may, in addition to determining whether to issue a citation, conduct ordinary inquiries such as checking the driver's license, determining whether the driver has outstanding warrants, and inspecting the vehicle registration and proof of insurance. *Id*. at 355. The "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 354. In *Rodriguez*, for example, a traffic stop was unlawfully prolonged after a police officer pulled over an SUV for swerving onto the shoulder of the road. After writing a warning ticket—and returning the license and registration and proof of insurance to the driver—the police officer made the driver wait for seven to eight minutes while he conducted a dog sniff, which unlawfully prolonged the stop.

As the Eleventh Circuit teaches, in light of *Rodriguez*, *supra*, "a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes. In other words, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." *Campbell*, 26 F.4th at 884 (internal citations omitted).

This record shows the Deputy did not delay or stall the stop. She did not act in a dilatory manner and any action that took time was a normal part of her process

for processing a traffic infraction. No fair reading of this record shows she did anything to extend that civil infraction "mission" unnecessarily.

Law enforcement officers are permitted to pursue an investigation, such as by asking for consent to search a vehicle, so long as the question is posed while active progress is being made to complete the traffic stop. *See Rodriguez*, 575 U.S. at 355 ("[A]n officer . . . may conduct certain unrelated checks during an otherwise lawful stop."); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (unrelated inquiries allowed "so long as those inquiries do not measurably extend the duration of the stop").

In *United States v. Vargas*, the Eleventh Circuit rejected the argument that an officer's request to search the defendant's vehicle unlawfully prolonged a traffic stop because the police officer had not completed his duties related to the stop at the time he made the request. 848 F. 3d 971, 974 (11th Cir. 2017). The Eleventh Circuit held that the officers permissibly asked for consent to search a car (eighteen minutes and thirty seconds into the traffic stop) because they were still engaged in tasks related to the traffic stop when the question was posed and did not add any time to the stop by asking the question. *Id*.; *see also United States v. Braddy*, 11 F.4th 1298, 1310–12 (11th Cir. 2021) (holding dog sniff conducted while officer was conducting routine records check and preparing traffic citation did not unlawfully prolong the traffic stop).

9

Here, Deputy Richter's message that her fellow deputies should ask the Defendant if he consents to a search, following up on a response, and notifying the other deputy that the dog was on its way were all made as she was entering the infraction data or as she was reviewing information about the Defendant. Ex. 2 at 2:20–2:35; 4:00; 4:50; 5:15. These did not prolong the stop in any measurable way.

Deputy Richter was working on completing the ticket when she provided information in response to a question about their location. Ex. 2 at 10:05–10:15. Similarly, when Deputy Richter asked the other deputy to remove Mr. Jelks from the vehicle and greeted the K-9 officer, she was still working on the ticket and said so on the tape. Ex. 2 at 13:30–13:55.

"Traffic stops are 'especially fraught with danger to police officers.'" *Rodriguez*, 575 U.S. at 356 (quoting *Johnson*, 555 U.S. at 330). Therefore, "officers conducting a traffic stop may 'take such steps as are reasonably necessary to protect their personal safety.'" *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). This includes having the driver step out of the car in a routine stop. *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009).

Deputy Richter alighted from her vehicle when Mr. Jelks rolled up his tinted window and did not promptly get out of his car when the other deputy commanded. This was caused by Mr. Jelks and Deputy Richter's reaction was for officer safety.

10

Any delay (less than ten seconds) was attributable to Jelks' behavior creating a safety concern, not to delay for a dog sniff. As part of the traffic stop Deputy Richter had seen Jelks' long record, and Jelks' conduct presented safety issues.

At no time did Deputy Richter engage in inculpatory-type questioning as was present in *Campbell*, 26 F.4th at 868–69, 885. Nor was there post-infraction delay like *Rodriguez*, 575 U.S. at 350–52.

## *CONCLUSION*

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that Defendant Reginald Jelks' motion to suppress, Dkt. 24, is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, on June 20, 2025.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO:**
Counsel of record